

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GENEVA ZBORALSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 06 C 3772 |
| | ) |
| TOM MONAHAN, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Geneva Zboralski brought this action against defendants Tom Monahan, Tim Budz, Darrell Sanders, Steve Strock, JoEllen Martin, Diane Franzen, Lori Biermann, and Brenda Wilts (collectively "defendants"), in their individual capacities, alleging violations of her constitutionally-protected Fourth and Fourteenth Amendment rights, invasion of privacy and assault and battery. The claims arise from a series of searches defendants performed on plaintiff in May and June 2005, when she was visiting her husband, who was civilly committed in an Illinois treatment and detention facility. Defendants now move for summary judgment on plaintiff's claims. They also move to strike certain of plaintiff's responses to defendants' statement of facts, and certain of plaintiff's additional facts. For the following reasons, defendants' motion to strike is granted in part. Their summary judgment motion is granted as to defendants Monahan and Budz, and as to the invasion of privacy claim. It is denied as to defendant Martin, and entered and continued as to the remaining defendants.

### Motion to Strike

Defendants argue that numerous of plaintiff's facts and responses should be stricken for failure to comply with Local Rule 56.1. Specifically, defendants argue that several of

plaintiff's responses and facts are based on speculation, hearsay or unauthenticated documents, and are non-responsive, argumentative or conclusory. We address each argument in turn.

Defendants argue that two additional facts and one response contain inadmissible hearsay. The paragraphs all involve statements by certain TDF employees (or in one case Department of Health Services ("DHS") general counsel) made to either plaintiff or other TDF employees. Each one is hearsay because it is being offered for the truth of the matter asserted – first, that Martin instructed other officers to require plaintiff to remove her shoes, second, that shoe removal was only required if the person was suspected of bringing in contraband, and third, that visitors were not to be scanned with the Rapiscan. None of these statements falls within any recognized exceptions to the hearsay rule.[1] They are not admissions because the people making the statements are not party opponents since the facility as a whole is not a party to this action. While Martin's alleged statement to the officers would count as an admission, it is couched within the statement of the non-party officers to plaintiff that does not satisfy that exception. The statement about the shoes is not being offered to show the effect on the listener – plaintiff is offering it to show that she should not have had to remove her shoes, not how she felt about being told she should not have to. The same can be said for the statement about the Rapiscan searches. Therefore, to the extent that the foregoing statements are hearsay, they are stricken.

Next, defendants take issue with several of plaintiff's facts that rely on allegedly unauthenticated materials, namely, the Rapiscan operation manual and two web pages. With

---

[1] Furthermore, plaintiff does not lay any foundation for the statement from DHS general counsel Dyslin to defendant Budz that the TDF could not scan visitors and had to stop. She testifies that she found out, but does not state how or from whom (plaintiff dep. p. 63).

regard to the manual, plaintiff responds by including a letter from Rapiscan's counsel to plaintiff's counsel, which accompanied delivery of the manual pursuant to subpoena. Plaintiff's counsel also submits a declaration that the CD delivered to counsel (the manual in .pdf format) is the same as the pages plaintiff reproduced for this court. While plaintiff has failed to file a declaration of a Rapiscan employee verifying the authenticity of the manual, defendants have failed to offer any evidence that the manual is not authentic or is not the correct manual for the model of Rapiscan located at the TDF during the period in question. Therefore, we find plaintiff's submissions sufficient. However, with regard to the web pages, plaintiff's submissions are not sufficient. Even if the authenticity were not challenged, both web sites contain hearsay statements that plaintiff is offering for their truth. Neither web page submission satisfies any recognized exception to the hearsay rule and therefore neither is admissible.

Defendants argue that several of plaintiff's additional facts are based on impermissible speculation. This court is clearly capable of detecting and disregarding speculation and will do so without necessitating the striking of offered facts.

Finally, defendants argue that certain responses and facts are insufficiently supported. Upon review of the paragraphs cited, we find that all are sufficiently supported by plaintiff's deposition testimony, except that in paragraph 6 there is no support for the proposition that Martin "ran her finger" between plaintiff's vaginal lips. Her testimony only states that Martin's finger "went between" plaintiff's vaginal lips. That characterization is stricken, but the rest of the paragraph remains.

Therefore, paragraphs 34 of plaintiff's response and paragraphs 16, 18, and 38 of plaintiff's statement of facts are stricken. Paragraph 6 is stricken only as to the phrase

discussed above.

## Motion for Summary Judgment

### BACKGROUND

Plaintiff is married to Brad Lieberman, a civilly committed resident of the Illinois Department of Human Services' Treatment and Detention Facility ("TDF") in Joliet, Illinois. Plaintiff regularly visited her husband at the Joliet TDF from 2000 through July 2005. From 2000 until sometime in May 2005, plaintiff was always patted down before being allowed inside the TDF. Searches of visitors are necessary to prevent contraband from being brought inside the facility. TDF personnel were not allowed to strip-search visitors. Each pat-down search was performed by a TDF employee of the same gender as the visitor. Prior to May 2005, plaintiff did not have any problem with being patted down before entering. Plaintiff has never been suspected of bringing contraband into the facility.

During May 2005, defendant JoEllen Martin was a security therapy aide at the TDF. She worked second shift from 2:45 p.m. to 11:15 p.m. There were times when plaintiff arrived that Martin was working patting down other visitors at the front entrance. However, during this period, plaintiff believed that Martin made a point of being the person to pat her down. Plaintiff stated that Martin always told her she was on her way out to have a cigarette when plaintiff arrived (plf. dep. p. 40). At least one other employee, a man named Thompson, joked to plaintiff that Martin was her friend and buddy. Plaintiff felt like "people were making innuendos" (plf. dep. p. 19, 49). The teasing made plaintiff uncomfortable, but not so uncomfortable that she felt the need to report it.

Martin patted plaintiff down between ten and 20 times in May 2005. During these pat-

downs she took plaintiff around the corner out of view of the security office and security camera.[2] During the full body pat-down search, Martin would pat-down one leg and then the other. She never patted down a visitor's chest or the small of the back. Plaintiff believed that during three of the pat-downs, Martin touched her vaginal area momentarily. The first time it happened, plaintiff felt Martin's index finger briefly move up between her vaginal lips, pushing her pants between her vaginal lips. Plaintiff, giving Martin the benefit of the doubt, thought this was possibly an accident and did not tell anyone what occurred. The second time it occurred, plaintiff felt Martin's finger momentarily go between her vaginal lips. She did not say anything to Martin. The third time, plaintiff felt Martin briefly touch her vaginal area. Again, she did not say anything to Martin, nor did plaintiff try to move away from her. During each instance, plaintiff did not have any physical reaction to the contact from Martin. Plaintiff admits it possible that if she shifted during the pat-down of her legs, Martin's hand might have made incidental contact with plaintiff's body between her legs. However, at least during the first incident, plaintiff was standing still and not moving. Martin's touching made plaintiff feel as if she had been sexually assaulted. The parties dispute whether there were other female officers available at the times in question besides Martin to pat plaintiff down.[3]

Plaintiff complained about Martin's pat-down searches to defendants Strock and

---

[2] It appears through plaintiff's testimony that Martin did not single plaintiff out in this regard. At one point in her testimony plaintiff concedes that two or three other visitors were being patted down with her in the same area of the facility (plf. def. p. 36).

[3] While not relevant to plaintiff's claims, the parties also do not dispute the following facts. During a three-week period in May 2005, Martin repeatedly made plaintiff remove her shoes during searches. She alleges that at Martin's direction at least two other officers required her to do the same. Plaintiff claims she was the only visitor Martin required to remove her shoes, noting that other visitors visiting at the same time as she were not required to remove their shoes. She believes she was singled out to be searched by Martin and asked to take her shoes off. Furthermore, Martin did not actually inspect plaintiff's shoes or look at the bottom of her feet. Plaintiff was not bothered by the general idea of having to remove her shoes, but was bothered by the fact that she was the only visitor required to do so, and by the fact that Martin did not actually inspect her shoes or feet.

Sanders, both TDF supervisors. Plaintiff complained to defendant Strock that she felt she had been sexually assaulted and that she did not want Martin touching her anymore. She was told that she had the option of either being patted down when she entered the facility or scanned with the TDF's "Rapiscan." A Rapiscan is a machine that uses "back-scatter" X-ray technology to conduct a body scan.

To scan a person with the Rapiscan, the individual stands fully clothed in front of the machine, while a TDF employee presses a button and views an image of the outline of the person on the screen. The individual is then told to turn around and the employee scans the other side of the individual's body. The Rapiscan generally requires two people to operate. This is because the person inspecting the images is not supposed to see the search subject in person or know who is being searched, and the person interacting with the search subject is not supposed to be viewing the images. Rapiscan operators are advised to set up the machine in such a way as to provide this level of privacy for the search subject. The Rapiscan is capable of displaying images with varying degrees of accuracy, from images that look like black-and-white photos of a subject's body to images that include wrinkles and skin-folds. Any person viewing the displayed images can manually enhance them by adjusting the contrast, brightness, or by choosing other enhancement features. The Rapiscan has an attached printer that can produce printed copies of the scanned images of search subjects.

The Rapiscan at the TDF was used as a substitute for manual strip searches of residents. TDF employees were never searched using the Rapiscan, nor was any other visitor ever searched with the Rapiscan. Sanders made the offer to scan plaintiff without consulting his superiors, researching Rapiscan protocols, or other deliberation.

Officer Strock explained to plaintiff that the Rapiscan would show an outline of her

body, and plaintiff agreed to be scanned. The parties dispute whether plaintiff agreed to be given the choice between a pat-down or a body scan each time she entered the facility, or if she agreed permanently to the body scan in lieu of the pat-down. When plaintiff returned to the TDF later that same day, defendant Franzen told her she had to be searched with the Rapiscan in order to enter the facility. When plaintiff explained that she was to be given the option, Franzen disavowed any knowledge of such an option and told plaintiff she had to be scanned or she could not enter. While plaintiff was being scanned, several other TDF employees asked her why she was being searched with the Rapiscan and told her that they would never submit to such a search. In addition to the employees, other TDF visitors saw plaintiff being searched and asked her why she was being scanned with the Rapiscan. At no time was plaintiff asked to remove her clothing.

After being scanned, plaintiff researched the Rapiscan on the internet and learned that it emitted radiation. She then decided that she did not want to be scanned again. She was upset by the information she read on the Internet regarding the Rapiscan and was upset by other people watching her being scanned. She felt that she was being seen naked by whoever was operating the Rapiscan, and that she was being made a spectacle in front of other TDF employees and visitors. She left messages for Strock and Sanders, stating that she did not want to be scanned again. Strock called plaintiff and apologized for the confusion, stating that she could be patted down. Eventually the TDF staff stopped scanning plaintiff, but because of confusion in the ranks it took some time for the message to be relayed down the chain of command. As a result, for approximately three weeks plaintiff was scanned each time she entered the facility.

Plaintiff believed only three women scanned her, defendants Franzen, Wilts and

Biermann. Franzen scanned plaintiff twice, and was alone when she viewed plaintiff's image on the screen. Biermann was instructed by Franzen to scan plaintiff. She told plaintiff where to stand and when to turn for the scan, while Wilts viewed the image in a separate room. Biermann never saw nor printed plaintiff's image. Wilts also never printed plaintiff's image nor showed it to anyone else, always deleting plaintiff's image after she reviewed it. Plaintiff never saw her image either on the screen or in print, though she heard a rumor that her image was printed. Plaintiff's husband, Brad Lieberman, told defendant Strock that plaintiff's image was being left on the Rapiscan display and being viewed by male TDF employees.

Defendants Monahan and Budz had no involvement in the decision to permit plaintiff to be scanned and were not involved in the decision to allow her to again submit to pat-down searches. Budz was only told about the situation by Sanders, after the fact.

Plaintiff filed suit against defendants Monahan, Budz, Sanders, Strock, Franzen, Biermann and Wilts in their individual and official capacities, alleging violation of her Fourth and Fourteenth Amendment rights and sought relief pursuant to 42 U.S.C. § 1983. She also claimed invasion of privacy, alleging that the defendants saved and printed her image for other officers to view. Plaintiff further sued defendant Martin in her individual and official capacity, alleging assault and battery arising from the touching of her vaginal area during pat-downs. Plaintiff moved to proceed *in forma pauperis*, a motion we granted, though we dismissed the claims against all defendants in their official capacities. Defendants now move for summary judgment on all counts.

## DISCUSSION

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986). We draw all inferences and view all admissible evidence in the light most favorable to the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). This does not mean there must be no evidence supporting the non-moving party, but rather that the evidence is not enough to support a reasonable jury verdict. *Id.* at 248.

## Defendants Monahan and Budz

First, we grant summary judgment to defendants Monahan and Budz. The uncontested facts demonstrate that neither defendant had any personal involvement in the alleged incidents of which plaintiff complains. Plaintiff makes no argument against awarding summary judgment to these two defendants and, accordingly, we do so.

## Invasion of Privacy

Defendants move for summary judgment in plaintiff's invasion of privacy claim, arguing that plaintiff has offered no evidence that her image was saved, printed or misused. We agree. Plaintiff does not appear to argue this count in her response to summary judgment. Even if plaintiff could make a claim of invasion of privacy as a prison visitor, the fact that she "heard rumors" that her image was saved is not sufficient to counter a motion for summary judgment, nor is the fact that her husband told defendant Strock that the image was being circulated. Plaintiff offers no evidence of Lieberman's personal knowledge of his statement to Strock, nor does she offer any other evidence demonstrating that her image was in fact saved, printed or inappropriately viewed by officers. Therefore, summary judgment on this count is appropriate.

## Section 1983

Plaintiff alleges that defendants Strock, Sanders, Franzen, Biermann and Wilts conducted an illegal search in violation of the Fourth Amendment, when they subjected her

to the Rapiscan several times without her consent. Plaintiff seeks damages as permitted by 42 U.S.C. § 1983. Defendants argue that they are entitled to qualified immunity. Qualified immunity protects public officials in those situations where the law is not sufficiently clear for a reasonable official to have known that her actions were illegal. Phelan v. Vill. of Lyons, 2008 U.S. App. LEXIS 13571 (7th Cir. June 27, 2008). We engage in a two-part test to determine if immunity exists. First, we consider whether, taken in the light most favorable to plaintiff, the facts alleged amount to a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Second, we ask whether the right was clearly established at the time of the alleged violation. *Id.*[4]

The Fourth Amendment protects the right of persons not to be subjected to unreasonable searches or seizures. Reasonableness "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Bell v. Wolfish, 441 U.S. 520, 559 (1979). A detention facility is a "unique place fraught with serious security dangers," and in such places the Fourth Amendment does not apply with full force. However, courts have held that visitors to such facilities do not lose all of their constitutional rights upon entry. Burgess v. Lowery, 201 F.3d 942 (7th Cir. 2000). The question is whether the Rapiscan search of plaintiff was reasonable under the circumstances.

Reasonableness

This is a case of first impression. No other court, state or federal, has yet addressed this issue. We therefore draw from analogous case law relating to other types of searches of prison visitors and border entrants.

---

[4] We note that the Supreme Court recently granted *certiorari* to determine whether Saucier should be overruled. However, as the Seventh Circuit explained, until that time lower courts remain bound by the decision. Phelan, 2008 U.S. App. LEXIS 13571.

Neither the Supreme Court nor the Seventh Circuit has addressed whether any suspicion is necessary for a pat-down of a prison visitor. The Sixth Circuit has held that pat-down searches of prison visitors require no suspicion. Spear v. Sowders, 71 F.3d 626, 630 (6th Cir. 1995). Other district courts have cited Spear for this proposition. Beckta v. Maloney, 2001 U.S. Dist. LEXIS 18328 (D. Mass. Oct. 17, 2001); Jordan v. Taylor, 2001 U.S. Dist. LEXIS 24865 (E.D. Ark. Nov. 13, 2001). In a similar setting, regarding airline travelers, the Seventh Circuit has held that a pat-down requires "some level of suspicion" – more than none, but less than reasonable suspicion. Dorsey, 641 F.2d at 1219. It is unclear how this holding would translate, if at all, to the pat-down of prison visitors. Regardless, plaintiff does not argue that pat-down searches of prison visitors without suspicion is unreasonable. Therefore, for the purposes of this case, we will deem reasonable suspicionless pat-down searches of prison visitors.

The Seventh Circuit has held that strip searches of prison visitors are invasive and require, at the very least, reasonable suspicion that the particular visitor in question is hiding contraband. Burgess, 201 F.3d at 945. This is consistent with all other circuits that have addressed the issue. See Blackburn v. Snow, 771 F.2d 556 (1st Cir. 1985); United States v. Johnson, 1994 U.S. App. LEXIS 14701 (4th Cir. June 15, 1994); Thorne v. Jones, 765 F.2d 1270 (5th Cir. 1985); Daugherty v. Campbell, 935 F.2d 780 (6th Cir. 1991); Hunter v. Auger, 672 F.2d 668 (8th Cir. 1982); Kirkpatrick v. Los Angeles, 803 F.2d 485, 489 (9th Cir. 1986); Boren v. Deland, 958 F.2d 987, 988 (10th Cir. 1992).

To determine whether a body scan is akin to a pat-down or a strip search, "the key factor...is the level of embarrassment and intrusion that the person searched feels.'" Adrow v. Johnson, 623 F. Supp. 1085 (N.D. Ill. 1985) citing United States v. Dorsey, 641 F.2d 1213,

1217 (7th Cir. 1981).

On the one hand, a body scan is not as intrusive as an actual strip search because the visitor is not forced to disrobe, nor is she touched. Stephen Vina, *Comment: Virtual Strip Search at Airports: Are Border Searches Seeing Through the Fourth Amendment?*, 8 Tex. Wesleyan L. Rev. 417 (Spring, 2002). Some would argue that a body scan is actually *less* intrusive than a pat-down, because no contact is made with the subject's body. *Id.* Further, a body scan essentially covers the scope of a pat-down, revealing only what is under the clothes but above the skin. *Id.*

On the other hand, some would argue that a body scan visually reveals as much as a strip search – it can include fat folds and genitalia. *Id.* But that depends on the level of detail of the subject's image. As stated above, the Rapiscan is capable of producing an image that appears like an outline of a person's body, with very little detail. It is also capable of producing a highly-detailed image, which includes genitalia and fat folds.

The fact that the image is produced through the use of X-rays must also be taken into account. In this way, a body scan is similar to an internal X-ray – the person is not required to disrobe, yet intimate parts of the body are revealed. *Id.* Neither the Supreme Court nor the Seventh Circuit has identified what level of suspicion is sufficient to justify an X-ray search of either a prison visitor or a border entrant, though the Fifth, Eighth and Eleventh Circuits concur that a reasonable suspicion that a person is an alimentary canal smuggler may justify an involuntary X-ray examination. See <u>United States v. Oyekan</u>, 786 F.2d 832, 837 (8th Cir. 1986); <u>United States v. Vega-Barvo</u>, 729 F.2d 1341, 1348-49 (11th Cir. 1984); and <u>United States v. Mejia</u>, 720 F.2d 1378, 1381-82 (5th Cir. 1983). On one hand, medical X-rays are intrusive in ways that a body scan is not, in that exposure to those X-rays poses serious medical risks.

Vina, *supra* at 432. Because body scan technology only emits extremely low doses of X-rays and because those X-rays do not penetrate the body but bounce off, it poses fewer risks than internal X-rays. *Id.* At the same time, there is a question as to what is considered more intimate, a person's inner organs or their outer genitalia. *See* Lauren Bercuson, *Comment: Picture Perfect? X-Ray Searches at the United States Border Require Guidance*, 35 U. MIAMI INTER-AM L. REV. 577, 596 (Summer, 2004)(arguing that the level of modesty surrounding one's internal organs is comparatively lower than that surrounding genitalia).

In addition, we look at how the Rapiscan is currently being used. At the TDF, the Rapiscan was purchased exclusively as a substitute for strip searches of residents, not for searches of visitors or employees. Similarly, regulations designated by United States Customs for the use of body scan technology at the border state that customs official may only subject person to a body scan with "good reason," a standard similar to reasonable suspicion. Press Release, United States Customs and Border Patrol, Body Imaging Systems (Jan. 27, 2000), http://www.cbp.gov/hot-new/pressrel/2000/0127-00.htm. While this press release was issued before the events of September 11, 2001, it appears the policy remains the same. *See* Paul Giblin and Eric Lipton, *New Airport X-Rays Scan Bodies, Not Just Bags*, N.Y. TIMES, Feb. 24, 2007, at A1.

While the foregoing gives us some basis upon which to rule regarding reasonableness, we do not believe that it is enough, given the fact that this issue has never before been addressed. Several important questions remain that cannot be answered on this record. For instance, we have very little evidence of how the Rapiscan actually works and the quality of images it produces. Examples and experts in the field would be helpful to better understand body scan technology. We would also appreciate testimony on how reasonable persons would

feel being subjected to such a scan. Is it psychologically similar to, or even less intrusive than a pat-down because the person cannot view his or her own image and no touching is involved? Or is the thought that another person might be viewing a detailed naked image enough to make a person feel as violated as they would during a manual strip search? Finally, we are unsure whether the level of detail affects whether or not the search is closer to a pat-down or a strip search. Will every body scan search need to comport with the same standard of reasonableness regardless of the level of detail in the image? Or will factual determinations need to be made in each case depending on how the machine was calibrated at the time of the search? How was the machine calibrated in this case? We do not have that evidence. Because we do not believe the record is sufficiently developed to allow us to rule on this issue of first impression, we request that a hearing be held and the parties confer so that we may discuss the logistics of such a hearing.

Consent

Defendants argue that we need not reach the question of constitutionality because there is no genuine issue that plaintiff consented to the searches. We disagree. Initially, there is a question of fact as to whether plaintiff actually agreed to a Rapiscan search each and every time she entered the facility, or whether she agreed to decide each time she entered whether to be patted-down or scanned. There is no question of fact that plaintiff did not consent to the actual Rapiscan searches performed on her. It is undisputed that when plaintiff arrived at the TDF she was informed by defendant Franzen that she would have to undergo a Rapiscan search in order to enter the facility. Defendants admit that plaintiff repeatedly told Franzen that she was to have the choice, but Franzen stated that plaintiff's only choice was to submit to a scan or not visit her husband. This amounts to an "unconstitutional condition." Burgess,

201 F.3d at 945-47. Plaintiff may have no constitutional right to visit her husband in the TDF, (Mayo v. Lane, 867 F.2d 374 (7th Cir. 1989)), but this does not mean that in order to visit him she must consent to an unconstitutional search. Burgess, 201 F.3d at 945-47. In Burgess, the Seventh Circuit held that a policy requiring the strip search of all visitors of death row inmates was "manifestly unreasonable," and thus the visitor's consent to such searches could not immunize defendants from liability for the unconstitutionality of the search. *Id.* In order for consent to be a defense, the search must be reasonable, a question which at this juncture we cannot answer for the reasons set forth above. *See also* Blackburn, 771 F.2d at 569; Cochrane v. Quattrocchi, 949 F.2d 11 (1st Cir. 1991); Spear, 71 F.3d at 632. Therefore, we cannot yet say whether plaintiff's consent was valid as a matter of law.

Assault and Battery

The parties dispute whether defendant Martin touched plaintiff's vaginal area to varying degrees during three of her ten to twenty pat-down searches in May 2005. However, Martin argues that even if she did, it would not constitute assault or battery. Under Illinois law, "[a] person commits an assault when, without lawful authority, he engages in conduct which places another in reasonable apprehension of receiving a battery." 720 Ill. Comp. Stat. 5/12-1(a). "A person commits battery if he intentionally or knowingly without legal justification and by any means makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(2). Defendants do not argue that Martin's touching of plaintiff's vaginal area was an appropriate part of the pat-down routine, and therefore done with lawful authority. They do argue that the pat-down itself was lawful, and any touching by Martin was simply "incidental" to the pat-down. But such an argument turns on Martin's intent at the time -- an issue in dispute and one which is more appropriately suited for the trier

of fact. McGreal v. Ostrov, 368 F.3d 657, 677 (7th Cir. Ill. 2004)("It is rarely appropriate on summary judgment for a district court to make a finding on state of mind"). If the touching was incidental, and Martin did not intend to (or did not) touch plaintiff's vaginal area, no assault or battery occurred. But plaintiff disagrees and we must take the facts in the light most favorable to her, including the fact that the alleged touching occurred three times over a short period of time, Martin's statement that she was heading out to smoke each time plaintiff arrived at the TDF and the other TDF officers teasing of plaintiff's "relationship" with Martin. Drawing all inferences in plaintiff's favor, we cannot say as a matter of law that Martin did not intentionally touch plaintiff's vaginal area. Therefore, summary judgment is inappropriate.

Martin also argues that she is entitled to immunity. State rules of immunity govern actions in federal court alleging violations of state law. Benning v. Board of Regents of Regency Universities, 928 F.2d 775, 777-78 (7th Cir. 1991). In Illinois, a government employee is immunized from a common law suit for damages when acting in a policymaking and discretionary capacity. Section 2-201 of the Illinois Local Government and Governmental Employees Tort Immunity Act states: "Except as provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. However, battery "does not amount to an exercise of discretion or determination of policy" so as to provide Martin with immunity under this section. Valentino v. Hilquist, 337 Ill. App. 3d 461, 473, 785 N.E.2d 891 (Ill. App. Ct. 2003).

Furthermore, Martin is not protected by Section 2-202 of the Act, which protects a

public employee from liability for "act[s] or omission[s] in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." "Conduct is willful and wanton when it shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." Smith v. City of Chicago, 242 F.3d 737, 744 (7th Cir. 2001) citing 745 ILCS 10/1-210.

First, this provision does not include all activities that an officer engages in while on duty. Arnolt v. City of Highland Park, 52 Ill. 2d 27, 33 (Ill. 1972). It only extends "to the act or omission done while in the actual execution or enforcement of a law." Id. Martin does not allege that the pat-down was an execution or enforcement of a law, but even assuming it was, plaintiff alleges facts to demonstrate that Martin intentionally touched her vaginal area; a touching that defendants do not contend was part of a legal pat-down. A determination of whether this touching was willful or wanton requires the resolution of the disputed issue of Martin's intent – an issue for the trier of fact. Wilhold v. Gebke, 2005 U.S. Dist. LEXIS 20096, *10 (N.D. Ill. Sept. 1, 2005)(willful or wanton conduct is question of fact for the jury).

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted as to defendants Monahan and Budz, and as to the claim of invasion of privacy. It is denied as to defendant Martin. Finally, the motion is entered and continued as to defendants Strock, Sanders, Franzen, Biermann and Wilts. A status hearing is set for September 23, 2008.

JAMES B. MORAN
Senior Judge, U. S. District Court

Aug. 20, 2008.