# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GENEVA ZBORALSKI, | ) | |
| | ) | Case No. 06 C 3772 |
| Plaintiff, | ) | |
| | ) | Honorable Joan B. Gottschall |
| v. | ) | |
| | ) | |
| DARRELL SANDERS et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Geneva Zboralski brought this action under 42 U.S.C. § 1983 against eight employees of the Illinois Department of Human Services Treatment and Detention Facility in Joliet, Illinois ("TDF"). Zboralski alleged that defendants subjected her to an illegal body search in violation of her rights under the Fourth and Fourteenth Amendments. She also alleged invasion of privacy and assault and battery. The defendants moved for summary judgment on January 8, 2008. (Doc. 39.) Judge Moran granted the motion as to defendants Monahan and Budz and as to the claim for invasion of privacy. (Moran Opinion at 17.)[1] He denied summary judgment as to defendant JoEllen Martin on the assault and battery count, and he entered and continued the motion

---

[1] For the purposes of this opinion, the following citation conventions will be observed: Citations to Judge Moran's Memorandum Opinion and Order of August 20, 2008 (Doc. 74) will appear as Moran Opinion at __. Citations to the deposition of plaintiff Geneva Zboralski (Doc. 56-1) will appear as Zboralski Dep. at __. Citations to the deposition of defendant Diane Franzen (Doc. 56-5) will appear as Franzen Dep. at __. Citations to Defendants' Supplemental Statement of Facts in Support of their Motion for Summary Judgment (Doc. 99) will appear as Defs.' Stmt. ¶ __. Citations to Defendants' Supplemental Memorandum of Law in Support of their Motion for Summary Judgment (Doc. 98) will appear as Defs.' Mem. at __. Citations to Plaintiff's Local Rule 56.1(b)(3)(A) and (C) Response to Defendants' Statement of Facts and Statement of Additional Facts that Require Denial of Summary Judgment (Doc. 108) will appear as Pl.'s Stmt. ¶ __. Citations to Plaintiff's Amended Rule 56.1 Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 110) will appear as Pl.'s Resp. at __. Citations to all other record materials will be referenced by their docket number.

as to the five remaining defendants on the illegal search count.[2]  (*Id*.)  Those five

defendants now renew their request for summary judgment.  (Doc. 103.)

## I. BACKGROUND

Pursuant to the Illinois Sexually Violent Persons Commitment Act, 725 Ill. Comp.

Stat. 207/1 et seq., the State of Illinois was holding Zboralski's husband Brad Lieberman

at TDF from 2000 until, at least, July 2005.  Zboralski visited Lieberman at TDF

regularly—at times, on a daily basis.  (Zboralski Dep. at 13.)  When multiple visits were

possible, Zboralski would sometimes visit TDF as many as three times in one day.  (*Id*.)

Visitors to TDF were required to submit to a pat-down search before being

admitted to the facility.  When Zboralski visited in the evenings in May 2005, defendant

Martin often was the TDF employee who searched Zboralski.  (*Id.* at 17-18.)  Zboralski

alleges that Martin touched her inappropriately during three pat-down searches over the

course of three weeks.  That allegation forms the basis of the assault and battery claim on

which Judge Moran denied summary judgment.  (Moran Opinion at 15-17.)

Sometime in May or June 2005, Zboralski complained to defendants Darrell

Sanders and Steve Strock, respectively the Security Director and a Unit Director at TDF,

about the searches conducted by Martin.  (Defs.' Stmt. ¶ 10.)  According to Zboralski,

Sanders told her that "he would put a stop to it."  (Zboralski Dep. at 43-44.)  Strock

offered that, instead of being patted down, Zboralski could be searched using the TDF's

Rapiscan Secure 1000.  (*Id.* at 54-55.)  The Rapiscan is a device which uses backscatter

x-ray radiation to generate an image of a person which will reveal items concealed

underneath clothing or hair.  (Defs.' Stmt. ¶ 31.)  TDF used the Rapiscan, rather than

---

[2]     The illegal search count named defendants Darrell Sanders, Steve Strock, Diane Franzen, Lori
Biermann, and Brenda Wilts.

strip searches, to search residents who were returning from court appearances or meetings with visitors. The Rapiscan was not used on visitors or employees of TDF. (Pl.'s Stmt. ¶¶ 20-21.)

Strock told Zboralski that the image produced by the Rapiscan would reveal an outline of her body, and Zboralski agreed to be scanned. (*Id.* ¶ 12.) The parties dispute what precisely Strock told Zboralski, but Zboralski testified that she was told that she would be given the choice at each visit whether to be patted down or scanned. (Zboralski Dep. at 55-56.)

Upon her next visit to TDF, Zboralski was met by defendant Diane Franzen. Franzen told Zboralski that she would have to be scanned with the Rapiscan before entering the facility. (*Id.* at 57.) Zboralski testified that while she was being searched with the Rapiscan machine she was standing in a location where other TDF employees could see her. (Zboralski Dep. at 61-62.) According to Zboralski, several of those employees later expressed their surprise that she would allow herself to be scanned:

> A: After I was going there and being scanned, people were questioning as to why, what was going on, and that there's no way that they would allow anybody to do that to them.
> Q: Who were those people?
> A: Just employees that work there.
> . . .
> A: . . . They couldn't understand think [*sic*] why I was being Rapiscanned, because I had never been accused of anything, or there was never any suspicion of me ever doing anything wrong.

(*Id.* at 65-67.) During the search, Zboralski was completely clothed, except that she was asked to remove her shoes. (*Id.* at 64.)

Zboralski testified that she never saw the images produced by the Rapiscan. (*Id.* at 70.) Franzen testified that she would have Zboralski stand in front of the Rapiscan

machine while Franzen would go into a separate room to view the image. (Franzen Dep. at 21.) Franzen described the room as the size of a closet, and she stated that no one else was present or able to see the image. (*Id.* at 26.)

After the first scan, Zboralski researched the Rapiscan on the Internet and was alarmed by what she saw. (Defs.' Stmt. ¶ 15.) Zboralski found photos on the Internet which appeared to be images generated by the same Rapiscan model:

> A: It shows everything.
> Q: Everything?
> A: The size of your breasts; the size of your genitals if you're a male; your vagina; your buttocks. It shows if you've got prosthetics or breast implants or any of that information.

(Zboralski Dep. at 68.) She testified that, "I felt like I had been – I was humiliated. I felt like I had been strip-searched standing right there in that hallway for everybody to see." (*Id.* at 64.) Zboralski also read on the Internet that the Rapiscan "emits radiation." She testified that, "I'm a cancer survivor, so there was a scare there as well." (*Id.* at 72.)

Zboralski left phone messages for both Strock and Sanders saying that she no longer wanted to be scanned. (Defs.' Stmt. ¶ 15.) According to Zboralski, she eventually spoke to Strock on the phone, and he assured her that she was not to be scanned again. (Zboralski Dep. at 77-78.) But when Zboralski visited TDF over the next three weeks, TDF employees continued to insist that she be searched with the Rapiscan. (*Id.* at 75.) According to Zboralski, Franzen used the Rapiscan another twenty or more times (*id.*), although Franzen only recalled using the device two or three times (Franzen Dep. at 26.). Zboralski also remembered being scanned once by defendant Lori Biermann and once by defendant Brenda Wilts. (*Id.* at 75-76.) Eventually, TDF stopped using the Rapiscan and resumed using pat-down searches to screen Zboralski. (Defs.' Stmt. ¶ 18.)

Zboralski filed her complaint on July 12, 2006. The case was assigned to Judge Moran. The defendants answered, and then filed a motion for summary judgment on January 30, 2008. (Doc. 42.) In connection with the motion, defendants submitted the complaint, the answer, depositions of Zboralski and four of the defendants, and affidavits from five defendants. (Doc. 49.) Zboralski attached to her response some of the same depositions as well as two articles about the Rapiscan and a document entitled "Rapiscan Secure 1000 Whole Body Imager Operator Manual" which she claims to have received from the manufacturer. (Doc. 56, Exs. 1-8.)

Judge Moran issued a Memorandum Opinion and Order on August 20, 2008 granting in part, denying in part, and continuing in part defendants' motion. (*See* Moran Opinion.) Judge Moran granted summary judgment to defendants on Zboralski's invasion of privacy claim because she offered no "evidence demonstrating that her image was in fact saved, printed or inappropriately viewed by officers." (*Id.* at 9.) Judge Moran held that summary judgment was not appropriate for the claim of assault and battery against defendant Martin. The factual question of whether Martin intended to touch Zboralski inappropriately could not be resolved on a motion for summary judgment. (*Id.* at 15.)

As to Zboralski's claim of unlawful search, Judge Moran concluded that a factual question existed about whether Zboralski consented to the search. (*Id.* at 14-15.) However, Judge Moran entered and continued defendants' motion as to this count, leaving undecided the question whether the Rapiscan search was reasonable under the Fourth and Fourteenth Amendments. The court stated:

> While the foregoing gives us some basis upon which to rule regarding reasonableness, we do not believe that it is enough given the fact that this

issue has never before been addressed. Several important questions remain that cannot be answered on this record. For instance, we have very little evidence of how the Rapiscan actually works and the quality of images it produces. Examples and experts in the field would be helpful to better understand body scan technology. We would also appreciate testimony on how reasonable persons would feel being subjected to such a scan. Is it psychologically similar to, or even less intrusive than a pat-down because the person cannot view his or her image and no touching is involved? Or is the thought that another person might be viewing a detailed naked image enough to make a person feel as violated as they would during a manual strip search? Finally, we are unsure whether the level of detail affects whether or not the search is closer to a pat-down or a strip search. Will every body scan search need to comport with the same standard of reasonableness regardless of the level of detail in the image? Or will factual determinations need to be made in each case depending on how the machine was calibrated at the time of the search? How was the machine calibrated in this case? We do not have that evidence.

(*Id.* at 13-14.) Before the summary judgment motion could be renewed, the case was reassigned to this court.

Defendants filed their Supplemental Motion for Summary Judgment on February 10, 2010. Attached to their motion, the defendants submitted a report from a proposed expert Andreas Kotowski who is the Chief Technology Officer of Rapiscan Systems, Inc. and several exhibits to the expert report. (Doc. 99, Ex. I.) Zboralski did not depose Kotowski but did submit some additional exhibits with her response. (*See* Pl.'s Resp.)

## II. ANALYSIS

Defendants make two arguments in support of their motion. First, defendants contend that summary judgment is appropriate because the search of Zboralski was reasonable within the meaning of the Fourth and Fourteenth Amendments. And, second, defendants are entitled to qualified immunity because any constitutional right to be free from a search by the Rapiscan was not clearly established. As the court agrees with the defendants on the first issue, it need not reach the question of qualified immunity.

**A.      Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party always bears the initial burden, even though another party may bear the burden on a particular issue at trial.  *Id.* at 323.  The moving party can satisfy its burden in one of two ways.  The movant may present evidence, in one of the forms permitted by the rule, which negates the opponent's claims.  Alternatively, the movant may point out to the court that the opponent will be unable to meet its burden at trial because of an absence of evidence on an essential element.  *Id.* at 325.

At this point, the burden shifts to the opponent of summary judgment to "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The nonmoving party must go beyond mere allegations and demonstrate that it will be able to present evidence which would permit a jury to find in its favor.  *Celotex*, 477 U.S. at 323-24.

The court may not weigh the evidence or make judgments about credibility. Factual questions must be decided by the trier of fact.  *Homan Mfg. Co. v. Long*, 242 F.2d 645, 656 (7th Cir. 1957).  At the summary judgment stage, the court should view the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor.  *Cedillo v. Int'l Ass'n of Bridge & Structural Iron Works, Local Union*

*No. 1*, 603 F.2d 7, 11 (7th Cir. 1979).  But a party that cannot demonstrate that it will be able to meet its burden is not entitled to a trial.

The evidence presented at this stage must comport with the Federal Rules of Evidence and be admissible at trial, *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010), or it must consist of affidavits "made on personal knowledge, set[ting] out facts that would be admissible in evidence, and show[ing] that the affiant is competent to testify on the matters stated," Fed. R. Civ. P. 56(e)(1). Evidence with no foundation in personal knowledge cannot defeat a motion for summary judgment.  *FDIC v. Meyer*, 781 F.2d 1260, 1267 (7th Cir. 1986).  And the presentation of crucial evidence cannot be delayed until trial.  *United States v. Various Firearms*, 523 F.2d 47, 51 (7th Cir. 1975).  Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wisconsin Dep't of Corr.,* 175 F.3d 497, 504 (7th Cir.1999), *overruled on other grounds by Higgins v. Mississippi*, 217 F.3d 951 (7th Cir. 2000)).

**B.      Fourth Amendment Standard**

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This provision is made applicable to the States by the Fourteenth Amendment.  *Mapp v. Ohio*, 367 U.S. 643 (1961).  In general, a search requires a warrant supported by probable cause, or else some recognized exception to the warrant requirement must apply.  *United*

*States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002). "[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). In this case, there is no dispute that the TDF employees searched Zboralski with the Rapiscan machine. The only question is whether that search was reasonable.

The Fourth Amendment forbids only unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 9 (1868). No warrant will be required where, under the circumstances, the search was reasonable. *Bell v. Wolfish*, 441 U.S. 520, 558-59 (1979). Courts have recognized a class of searches which are reasonable without a warrant because of the government interest in security and the impossibility of obtaining a warrant. This type of search may be appropriate for persons crossing the border,[3] traveling through an airport,[4] and visiting a prison.[5] Relatively unintrusive searches may be reasonable in these circumstances absent any particularized suspicion because there is a diminished expectation of privacy and because the goal of maintaining security could not be met without subjecting all comers to a routine search. *United States v. Spear*, 71 F.3d 626, 630 (6th Cir. 1995). However, as the intrusiveness of the search increases, so must the degree of particularized suspicion supporting the search. *Id*. As the Supreme Court has stated:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of

---

[3]    *See, e.g., Yang*, 286 F.3d at 944 (citing *United States v. Ramsey*, 431 U.S. 606, 619 (1977)).

[4]    *See, e.g., United States v. Aukai*, 497 F.3d 955, 958 (9th Cir. 2007).

[5]    *See, e.g., United States v. Spear*, 71 F.3d 626, 629-30 (6th Cir. 1995).

the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell*, 441 U.S. at 559.

It is undisputed that TDF employees did not have any particularized suspicion that Zboralski was trying to smuggle contraband into the facility. Thus, the court must decide whether a suspicionless search using the Rapiscan technology violates the Fourth Amendment in the circumstances of this case.

The cases which are, perhaps, most analogous to this one are those involving prison visitors. As Judge Moran recognized in his opinion, all circuits to consider the issue, including the Seventh Circuit, have concluded that strip searches of prison visitors require at least reasonable suspicion. *See Blackburn v. Snow*, 771 F.2d 556, 563 (1st Cir. 1985); *United States v. Johnson*, No. 93-5792, 1994 WL 260806, at *2 (4th Cir. June 15, 1994); *Thorne v. Jones*, 765 F.2d 1270, 1276-77 (5th Cir. 1985); *Daugherty v. Campbell*, 935 F.2d 780, 787 (6th Cir. 1991); *Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982); *Boren v. Deland*, 958 F.2d 987, 988 (10th Cir. 1992).

Judge Moran found no case, and neither could this court, which addressed the constitutionality of a search using the backscatter x-ray technology. There are a few cases addressing whether a border entrant can be searched using a conventional x-ray. These courts have concluded that the government must have at least a reasonable suspicion that the person is an alimentary canal smuggler. *See United States v. Oyekan*, 786 F.2d 832, 837 (8th Cir. 1986); *United States v. Vega-Barvo*, 729 F.2d 1341, 1348-49 (11th Cir. 1984); *United States v. Mejia*, 720 F.2d 1378, 1381-82 (5th Cir. 1983).

In order to assess the constitutionality of the searches alleged to have been conducted in this case, the court must balance the intrusiveness of the search against the government interest in security. *See Bell*, 441 U.S. at 559; *Terry*, 392 U.S. at 20-21. There are a number of considerations that go into an examination of the intrusiveness of a search. In addition to considering the scope of the search, the court also looks to the subjective indignity that could be thought to result. *Vega-Barvo*, 729 F.2d at 1345-46. In *Terry*, the Supreme Court recognized that even a relatively unintrusive search such as a frisk "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry*, 392 U.S. at 17. Further, "the degree of community resentment aroused by particular practices is clearly relevant to an assessment of the quality of the intrusion upon reasonable expectations of personal security caused by those practices." *Id.* at 17 n.11. A search that has harmful physical effects could also be considered more intrusive. *See United States v. Elk*, 676 F.2d 379, 382 (9th Cir. 1982) (holding that x-ray search requires higher level of suspicion because of x-rays can be harmful to a subject's health).

On the other side of the equation, the court considers the government interest in ensuring security at the detention facility. Relevant to that inquiry is the need for security measures under the circumstances and the efficacy of the search in providing security. *See United States v. Albarado*, 495 F.2d 799, 805-06 (2d Cir. 1974).

C.   **Defendants' Burden**

The defendants as the movants have met their initial burden. Defendants argue that the search of plaintiff with the Rapiscan was reasonable under the circumstances, and that Zboralski has not presented evidence that raises a triable issue. They point to

evidence, including the deposition of plaintiff, showing that the search with the Rapiscan differed from a strip search. (*See* Defs.' Mem. at 9.) For example, plaintiff was not required to remove her clothes. Defendants have also presented an affidavit by their expert Andreas Kotowski stating that the images produced by the Rapiscan are unlike photographs and do not reveal details of the body. (Defs.' Stmt. Ex. I ¶ 20.) Kotowski, the Chief Technology Officer of Rapiscan Systems, Inc., notes that the Rapiscan has been used for screening at airports, in prisons, and at government facilities. (*Id.* at ¶ 27.) He references a marketing study conducted by the manufacturer which found that passengers interviewed at Heathrow airport preferred the Rapiscan to a pat-down search. (*Id.* at ¶¶ 28-29.)

None of this evidence is conclusive—far from it; however, it is sufficient to meet the limited burden of the moving party. Zboralski challenges the admissibility of some of the defendants' evidence. However, even disregarding the evidence, defendants have succeeded in shifting the burden to plaintiff. Defendants need not present any evidence of their own. *Celotex*, 477 U.S. at 325. At trial, plaintiff will have the burden of showing that the search was unreasonable under the circumstances. Defendants contend that the record evidence is insufficient to make such a showing. Now, Zboralski must come forward with evidence to show that a genuine issue of fact exists.

## D.     Zboralski's Evidence

Zboralski argues that the Rapiscan search is just as intrusive as a manual strip search, and, under Seventh Circuit precedent, there must be at least reasonable suspicion to justify such a search of visitors to TDF. *See Burgess*, 201 F.3d at 945. The court first considers the evidence that the search was intrusive, focusing on the scope of the search,

the indignity aroused by the search, and the physical harm caused by the search. Then, the court considers the evidence pertaining to the government interest in maintaining security at TDF. Finally, viewing the evidence in the light most favorable to plaintiff, the court considers whether all the evidence taken together could possibly establish that the search of Zboralski was unreasonable.

1. Scope of the Search

As to the scope of the search, Zboralski contends that the Rapiscan is capable of producing images very close to a photograph of a naked body which show details which would otherwise only be visible in a full strip search. Zboralski points to a document, which was attached to her response to defendants' original summary judgment motion, entitled "Rapiscan Secure 1000 Whole Body Imager Operator Manual." (Doc. 56, Ex. 8.) The parties dispute whether this is the correct manual for the device used by TDF, and defendants object that plaintiff's manual is unauthenticated. Defendants provide their own manual, authenticated by Kotowski, which appears to be similar to the one provided by plaintiff, although clearly not identical. (Defs.' Stmt., Ex. I-Ex. B.)

Zboralski's manual indicates that the Rapiscan can be configured to display different levels of detail. The various settings include: "Default," "Outline," "Overlay," "Detailed," "Inverse," and "Standard." (Doc. 56, Ex. 8. at 3-5.) There are example images in the manual associated with each of these settings. (*Id.* at 3-6.) The images, available to the court only through an electronically filed black and white photo-copy, are very rough. The image associated with the "Default" setting appears to be only an outline of a black figure. Absolutely no details of the body can be discerned. The image associated with the "Detailed" setting shows some additional details—the court can

13

discern the bare outline of a buttocks—but it is not much more revealing than the "Default" image. Plaintiff's manual also indicates that, "Depending on the options configured, you can manually enhance images . . . ." (*Id.* at 3-7.) Neither Zboralski's evidence nor defendants' expert provide additional evidence about how the various settings function or the differences between the images produced by each setting.

Attached to Kotowski's expert report, defendants provide two images which are allegedly representative of those produced by a Rapiscan device. (Def.'s Stmt., Ex. I-Ex. D.) These images are considerably more detailed than the images in the manual provided by plaintiff. Although the images are not as clear as a photograph, a woman's breasts, buttocks, skin folds, and other features are identifiable. However, Kotowski does not inform the court whether these images are representative of all possible settings on the Rapiscan or whether the device is capable of producing other images which are more or less detailed.

Zboralski points out, and defendants admit, that the Rapiscan was used by TDF as a replacement for manual strip searches of detainees; TDF never intended to scan visitors or employees. (Pl.'s Stmt. ¶¶ 20-21.) Zboralski testified that TDF employees expressed to her their shock that she would allow herself to be searched by the Rapiscan. (Zboralski Dep. at 65-67.)

Defendants contend that the image of Zboralski was merely an outline of her body. They point to the testimony of Franzen, one of the TDF employees who scanned Zboralski:

> Q: Now, let me ask you this. Could you see the size of Geneva's breasts
> and genitals in this image?
> A: No, it was a line, like etch-a-sketch.

(Franzen Dep. at 22.) Franzen was not asked at her deposition about the settings of the Rapiscan. Franzen was not asked whether she had viewed the most detailed possible image of Zboralski or the least detailed.

Although the court must draw all reasonable inferences in favor of Zboralski, the court cannot conclude from this evidence that the image viewed by TDF employees using the Rapiscan showed any level of detail similar to a strip search. The record evidence shows, at best, that the Rapiscan *is capable* of producing a detailed image of a person's body. Plaintiff's own evidence suggests that the device can also produce an image which shows merely an outline of the body. We do not know, in this case, at what level of detail the Rapiscan searched Zboralski. Zboralski points to no evidence to contradict Franzen's testimony. Although a jury might disregard Franzen's testimony, it would have no basis for concluding that Franzen viewed a detailed image, rather than just an outline of Zboralski's body.

The fact that TDF used the Rapiscan in place of strip searches for detainees is not helpful to Zboralski for two reasons. First, TDF may have chosen to use the Rapiscan precisely because it was less revealing than a strip search but still accomplished the goal of locating contraband. And, second, there is no evidence that Franzen used the same setting to view Zboralski as TDF used to scan detainees.

2. Indignity Aroused by the Search

Zboralski testified that the Rapiscan search caused her extreme distress. She was made to feel uncomfortable because TDF employees saw her as she was being scanned. They later expressed their shock that she had permitted the scan. When Zboralski researched the Rapiscan online, she found distressing images which closely resemble

15

photographs of naked people. According to her testimony, Zboralski had problems eating and began losing weight. She felt the "whole ordeal was traumatizing," and she was "a nervous wreck." (Zboralski Dep. at 107-08.)

Zboralski also points to a series of other documents that she attaches to her response. On January 4, 2009, the U.S. House of Representatives approved a bill that would prohibit the use of backscatter x-ray technology to screen airport passengers "unless another method of screening, such as metal detection, demonstrates cause for preventing such passenger from boarding an aircraft." H.R. 2027, 111th Cong. § 2(2) (2009). The bill would also require passengers to be given a choice of being searched with a pat-down instead of the whole-body imager. *Id.* § 2(4). Zboralski attaches a print-out of the bill and the roll call vote. (Pl.'s Resp., Ex. FF.) She attaches a "Consultation" issued by the European Commission which sought input from experts on privacy concerns raised by body scan technology and called for the formation of a Body Scanners Task Force. (*Id.*, Ex. EE.) She attaches a document produced by the GAO which notes privacy concerns raised by TSA plans to purchase backscatter x-ray technology for use in airports. (*Id.*, Ex. GG.)[6]

The problem with all of this evidence is that it sheds no light on how a reasonable person would feel being subjected to the search that was conducted on Zboralski. Zboralski became upset when she learned that the Rapiscan was capable of producing detailed images. But there is no evidence that TDF employees viewed a detailed image of Zboralski. The Fourth Amendment protects a right to be free from unreasonable

---

[6] Zboralski also points to some record evidence showing that the Rapiscan had the capability to save or print images. Judge Moran previously concluded that there was no evidence that Zboralski's image was saved or printed in this case. (Moran Opinion at 9.) Zboralski offers no new evidence on this point nor any reason to revisit Judge Moran's holding.

searches, not to be free from subjective feelings of distress. Zboralski's feelings may be

relevant to an analysis of the reasonableness of the search but only if they are based on an

accurate understanding of what search is being conducted. Stated another way, the

indignity suffered by Zboralski was not caused by the search.

Zboralski admits in response to the defendants' Rule 56.1 statement of facts that,

after Strock told Zboralski that the machine would show only an outline of her body, she

agreed to be screened with the Rapiscan. (Defs.' Stmt. ¶ 12.) A jury could not conclude

that the Rapiscan image contained more than an outline of Zboralski. Thus her reaction

to Strock's proposal is the only relevant evidence of how a reasonable person would

respond to the search that actually occurred in this case.

3. Physical Harm Caused by the Search

Zboralski argues that the x-ray radiation used by the Rapiscan may cause physical

harm. She stated in her deposition and in her response that she is a cancer surviver and

concerned about the effects of the radiation. Defendants' expert states that the Rapiscan

differs from a traditional x-ray, and the small amounts of radiation are not harmful.

(Defs.' Stmt., Ex. I ¶ 19.) In her response, Zboralski states: "A recent study by scientists

at Sandia Laboratories suggests that these low-level radiation waves may have serious

health consequences as the study found that exposure to the radiation 'disassembles' or

unwinds DNA." (Pl.'s Resp. at 2.) She attaches an article about the study to her

response. (*Id.*, Ex. DD.) Even if the court could evaluate the scientific issues posed by

the article, the article is hearsay and cannot be considered as evidence at summary

judgment. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Zboralski

herself points out that very little data is available about backscatter x-ray technology

because it is so new, and she concedes "[w]hat additional injury could occur . . . is not known." (Pl.'s Resp. at 2.) Although the court has discretion to deny summary judgment to permit more time for discovery, the parties have already been given ample opportunity to marshall their evidence. Judge Moran entered and continued defendants' motion on August 20, 2008. (*See* Moran Opinion.) This court repeatedly extended plaintiff's deadline for expert discovery. (*See* Docs. 93, 96.) The period of discovery cannot be extended until the day that this technology is better understood. Thus, the court must consider that the plaintiff points to no evidence that there are any harmful physical effects of the Rapiscan search.

4. Government Interest in Maintaining Security

The intrusiveness of the search must be weighed against the government interest in securing the detention facility. In a prison context, an unintrusive search is permissible absent reasonable suspicion. *See Burgess*, 201 F.3d at 947. As the Seventh Circuit noted in *Burgess*, not all prisons are alike, and different circumstances will alter the reasonableness analysis. *Id.* TDF is not technically a prison. However, the Illinois Sexually Violent Persons Commitment Act appears to allow prisoners serving criminal sentences to be housed at TDF. *See* 725 Ill. Comp. Stat. 207/30(a).

The parties did not present much evidence about the facility, making it difficult to assess the government interest in this case. There is no evidence about the type of detainees housed, the number of detainees, or the conditions of their confinement. If visitors and detainees meet behind bullet-proof glass with constant supervision, more extensive searches of visitors would seem less reasonable. If, on the other hand, visitors

are left alone with detainees, or if TDF detainees are frequently found with contraband, then the state may have good reason to conduct more thorough searches.

Also relevant to the analysis is the efficacy of the Rapiscan. If the device is ineffective at finding contraband, then there can be no government interest in conducting the search. Zboralski argues that the Rapiscan has not been subject to neutral testing, so its efficacy is yet unproven. (Pl.'s Resp. at 2.) But, again, a lack of evidence does not assist plaintiff because she would bear the burden at trial of demonstrating ineffectiveness.

Zboralski argues that the search was unreasonable because she was singled out for screening with the Rapiscan, despite a lack of any particularized suspicion. All other visitors were screened with a pat-down search. By adhering to a policy of patting down visitors, defendants, in effect, concede that the government interest is adequately served by these limited searches. Any search that is more intrusive than a pat down would arguably be unreasonable under the circumstances. *See United States v. Aukai*, 497 F.3d 955, 962 (9th Cir. 2007) ("A particular airport screening search is constitutionally reasonable provided that it 'is no more extensive nor intensive than necessary . . . .'"). But Zboralski has not come forward with evidence that would permit a trier of fact to conclude that the Rapiscan is more intrusive than a pat-down. A pat down requires the screener to physically touch a visitor, feeling the outline of her body. As discussed above, the evidence here is that the Rapiscan creates an image of the outline of a visitor's body; no physical contact is required. Zboralski offers no other evidence that the Rapiscan search is intrusive; thus, she cannot show that, by singling her out, the defendants subjected her to any greater scrutiny than other visitors.

5.  Determining Reasonableness Under the Circumstances

Based on the record evidence, the court cannot conclude that the plaintiff has met her burden to show that there is a genuine issue of fact regarding the reasonableness of the Rapiscan search. At best, a trier of fact could conclude that the Rapiscan produced an image of Zboralski which showed an outline of her body. There is no evidence that this limited search caused any indignity. There is no evidence that the search caused physical harm. Although ordinarily, a jury must weigh the intrusiveness of the search against the government interest and determine whether a particular search is reasonable, the court concludes that no jury could look at the evidence presented and find that the search was unreasonable.

To be clear, the court does not hold that routine searches with this technology are reasonable. The holding of this opinion is that this plaintiff has failed to meet her burden of proof. The court does not conclude that the lack of any particular piece of evidence was fatal to Zboralski's claim. Rather, the failure to present evidence on each element of the analysis prevents the court from concluding that a triable issue exists as to the reasonableness of the search.

### III.  CONCLUSION

Defendants' motion for partial summary judgment is granted. Plaintiff's Fourth Amendment claim for unlawful search fails as a matter of law.

ENTER:

      /s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 29, 2010